1 | ROBBINS GELLER RUDMAN
    & DOWD LLP
2 | SHAWN A. WILLIAMS (213113)
    Post Montgomery Center
3 | One Montgomery Street, Suite 1800
    San Francisco, CA  94104
4 | Telephone:  415/288-4545
    415/288-4534 (fax)
5 | shawnw@rgrdlaw.com
    – and –
6 | DARREN J. ROBBINS (168593)
    MICHAEL J. DOWD (135628)
7 | DAVID C. WALTON (167268)
    THOMAS E. EGLER (189871)
8 | MATTHEW I. ALPERT (238024)
    655 West Broadway, Suite 1900
9 | San Diego, CA  92101
    Telephone:  619/231-1058
10 | 619/231-7423 (fax)
    darrenr@rgrdlaw.com
11 | miked@rgrdlaw.com
    davew@rgrdlaw.com
12 | tome@rgrdlaw.com
    malpert@rgrdlaw.com
13 |
    Attorneys for Plaintiff
14 |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| THE CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, | ) ) ) | No. |
|---|---|---|
| | ) ) | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | |
| RICHARD S. FULD, JR., CHRISTOPHER M. O'MEARA, ERIN M. CALLAN, MICHAEL L. AINSLIE, JOHN F. AKERS, ROGER S. BERLIND, THOMAS H. CRUIKSHANK, MARSHA JOHNSON EVANS, SIR CHRISTOPHER GENT, ROLAND A. HERNANDEZ, HENRY KAUFMAN, JOHN D. MACOMBER, CABRERA CAPITAL MARKETS, LLC, THE WILLIAMS CAPITAL GROUP, L.P., LOOP CAPITAL MARKETS, LLC, BBVA SECURITIES INC., BNY CAPITAL MARKETS, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

[Caption continued on following page.]

608320_1

1   CITIGROUP GLOBAL MARKETS INC.,        )
    RBC CAPITAL MARKETS CORPORATION,)
2   GREENWICH CAPITAL MARKETS, INC.,      )
    SUNTRUST CAPITAL MARKETS, INC.,       )
3   ABN AMRO INC., ANZ SECURITIES, INC.,  )
    CIBC WORLD MARKETS CORP., HSBC        )
4   SECURITIES (USA) INC., HVB CAPITAL    )
    MARKETS, INC., CAJA DE AHORROS Y      )
5   MONTE DE PIEDAD DE MADRID,            )
    NATIONAL AUSTRALIA CAPITAL            )
6   MARKETS, LLC, SANTANDER               )
    INVESTMENT SECURITIES INC., BNP       )
7   PARIBAS S.A., ING FINANCIAL           )
    MARKETS LLC, MELLON FINANCIAL         )
8   MARKETS, LLC, M.R. BEAL & COMPANY,)
    NATEXIS BLEICHROEDER INC., SG         )
9   AMERICAS SECURITIES, LLC, WELLS       )
    FARGO SECURITIES, LLC, WACHOVIA       )
10  CAPITAL MARKETS, LLC, HARRIS          )
    NESBITT CORP., DZ FINANCIAL           )
11  MARKETS LLC, MIZUHO SECURITIES        )
    USA INC., SCOTIA CAPITAL (USA) INC.,  )
12  SOVEREIGN SECURITIES                  )
    CORPORATION, LLC, UTENDAHL            )
13  CAPITAL PARTNERS, L.P., FORTIS        )
    SECURITIES LLC, MURIEL SIEBERT &      )
14  CO., INC. and DAIWA SECURITIES SMBC   )
    EUROPE LIMITED,                       )
15                                        )
                    Defendants.           )
16  _____  )

17

18

19

20

21

22

23

24

25

26

27

28

608320_1

**INTRODUCTION**

1.     The California Public Employees' Retirement System ("CalPERS") brings this action to recover losses suffered due to its purchases of the common stock and bonds of Lehman Brothers Holdings Inc. ("Lehman" or the "Company")[1] between June 12, 2007 and September 15, 2008, inclusive (the "Relevant Period"), including certain bonds purchased pursuant and/or traceable to the Company's false and misleading registration statement and prospectus, dated May 30, 2006, and filed with the Securities and Exchange Commission ("SEC") on Form S-3 (the "Registration Statement"), issued in connection with the Company's shelf registration or continuous offering process, seeking to pursue remedies under the Securities Act of 1933 ("1933 Act") and the Securities Exchange Act of 1934 ("1934 Act").  The Registration Statement, together with the prospectuses, prospectus supplements, product supplements and pricing supplements, as well as all SEC filings incorporated therein, are collectively referred to herein as the "Offering Documents."  These claims are asserted against certain of Lehman's officers and/or directors and the underwriters who made materially false and misleading statements during the Relevant Period in press releases, analyst conference calls and filings with SEC.

2.     Between 2006 and 2008, Lehman and its bankers raised billions of dollars in several offerings of investment-grade rated notes by means of the false and defective Registration Statement, including offering the bonds acquired by CalPERS.  As set forth herein, the Offering Documents that were filed in connection with the offerings at issue (the "Offerings") failed to disclose the true financial condition and performance of the Company.  Specifically, the documents failed to disclose Lehman's losses and exposure in connection with its subprime and Alt-A lending activities and the true value of the Company's mortgage-related assets.  The defendants' public statements, including in the Offering Documents, further failed to disclose the risks associated with Lehman's substantial increase in its use of leverage.  Lehman's executives also made materially false statements about its

---

[1]     Lehman is not a defendant in this lawsuit due to its filing, on September 15, 2008, for bankruptcy protection under Chapter 11 of the Bankruptcy Code.  Similarly, Lehman Brothers, Inc. ("LBI") is not a defendant in this lawsuit due to its forced dissolution on September 19, 2008.  LBI was wholly owned by Lehman and was Lehman's primary broker-dealer subsidiary.

financial condition causing Lehman's stock and bond prices to be artificially inflated. When Lehman's losses and exposure came to light, the revelations led to severe declines in Lehman's stock price and ultimately to its bankruptcy. Lehman also had engaged in manipulative quarter-end transactions called "REPO 105" transactions that hid billions of dollars of Lehman's debt from the public.

## OVERVIEW

3.      Prior to its bankruptcy filing, Lehman provided various financial services to corporations, governments and municipalities, institutions and high-net-worth individuals worldwide, including equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity.

4.      From 1994 to 2006, at the direction of defendant Richard S. Fuld, Jr. ("Fuld"), Lehman became increasingly involved in the mortgage market and securitizing mortgage-related products. Furthermore, at the direction of defendant Fuld, Lehman dramatically increased its use of leverage to fund its real estate investment activities from 2004 to 2007. As a result, Lehman's revenue and earnings grew at an impressive rate. Lehman engaged in securitizing mortgage-backed securities, becoming one of the largest issuers of mortgage-backed securities by the early 2000s. Mortgage-backed securities are created by purchasing mortgages and repackaging pools of mortgages into new securities. The new securities are divided into different types of tranches or slices classified by varying levels of credit risk and sold to investors. Lehman marketed and sold its mortgage-backed securities to large pension funds and other financial institutions.

5.      The demand for mortgage-related securitized transactions grew substantially from 1994 to 2005, generating a great deal of revenue for Lehman. In order to fuel the demand for its securitization transactions, Lehman purchased two mortgage lenders, BNC Mortgage ("BNC") and Aurora Loan Services LLC ("Aurora"). BNC specialized in the subprime mortgage market while Aurora specialized in the Alt-A market. An Alt-A mortgage or Alternate A-paper is a type of mortgage where the risk profile falls between prime and subprime. An Alt-A borrower has a credit score above subprime but the mortgage generally has some issues that increase its risk profile, such as higher loan-to-value or debt-to-income ratios or inadequate documentation of the borrower's

income.  Both BNC and Aurora engaged in risky lending practices in order to generate a greater number of loans for Lehman to purchase and securitize.

6.    The Offering Documents failed to adequately disclose Lehman's aggressive mortgage lending activities and the risks surrounding these activities, including failing to adequately discuss Lehman's relationship with its mortgage originators, including BNC and Aurora.  The Offering Documents further failed to properly value Lehman's mortgage-related assets or to provide proper risk disclosures concerning Lehman's mortgage-related exposure.  Additionally, the Offering Documents failed to provide adequate disclosures regarding the risks associated with Lehman's increased dependence on leverage to fund its real estate investment activities.  The Offering Documents further provided false assurances that Lehman was properly engaging in risk management strategies to minimize its real estate related risks.

7.    Throughout the remainder of fiscal year 2006 and through mid-fiscal year 2008, defendants continued to issue false and defective statements concerning Lehman's operations and its accounting for its real estate-related assets.  Defendants further downplayed Lehman's exposure to risky real estate assets and its leverage exposure.  In the meantime, Lehman was engaged at quarter end in an accounting gimmick called REPO 105 in which billions of dollars of debt was temporarily removed from Lehman's books and then reinstated following quarter end.  Internal emails at Lehman referred to this practice as basically "window dressing."

8.    On September 10, 2008, Lehman pre-released its results for the third quarter of 2008, reporting  a net loss of $3.9 billion and  $7.8 billion in write-downs, which included  $7 billion on its residential and commercial real estate holdings.  Four days later, Lehman filed the largest bankruptcy in U.S. history.

9.    The value of Lehman's securities collapsed.  *See* the following charts:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

10.     On October 6, 2008, the Committee on Oversight and Government Reform held hearings to determine the causes and effects of Lehman's bankruptcy.

11.     Further in October 2008, three separate criminal investigations were launched by the U.S. Attorney's offices in the Eastern and Southern Districts of New York as well as the District of New Jersey into the events surrounding the collapse of Lehman and whether the Company and its executives misled investors, including whether Lehman valued its assets at artificially high levels.

12.     The Bankruptcy Court-appointed examiner, Anton R. Valukas (the "Examiner"), later testified before the House Committee on Financial Services that "the public did not know there were holes in the reported liquidity pool, nor did it know that Lehman's risk controls were being ignored, or that reported leverage numbers were artificially deflated.  Billions of Lehman shares traded on misinformation."

13.     The true facts, which were known by the defendants but concealed from plaintiff during the Relevant Period, were as follows:

(a)     Lehman's true exposure to risk from mortgage-related transactions and assets was understated.

(b)     Lehman's subsidiaries, BNC and Aurora, were engaging in high-risk residential mortgage lending practices, which resulted in mortgage loans that would be much more likely to end up defaulting and causing losses.

(c)     Defendants failed to properly mitigate the risks associated with Lehman's mortgage financing activities.

(d)     Lehman violated Generally Accepted Accounting Principles ("GAAP") in preparing and disseminating false and misleading financial statements with respect to its accounting for mortgage-related assets.

(e)     Lehman was engaging in quarter end accounting manipulations that understated its debt in quarterly financial statements by billions of dollars.

(f)     The extent of Lehman's leverage exposure was misstated.

1      (g)    Defendants represented that all of Lehman's assets were presented at "fair value." Lehman, however, failed to consider market information when valuing certain of its commercial real estate assets, thereby materially overstating their value.

      (h)    Lehman's internal controls were inadequate to prevent the Company from engaging in risky lending practices.

      (i)    The Company's capital base was not adequate enough to withstand the significant deterioration in the real estate markets and, as a result, Lehman would be forced to file for bankruptcy protection due to its subprime and Alt-A exposure.

### INTRADISTRICT ASSIGNMENT

14.    A substantial part of the events or omissions which give rise to the claims in this action occurred in the county of San Francisco, and as such this action is properly assigned to the San Francisco division of this Court.

### JURISDICTION AND VENUE

15.    This Court has jurisdiction over the subject matter of this action pursuant to §22 of the 1933 Act, 15 U.S.C. §77v; §27 of the 1934 Act, 15 U.S.C. §78aa; and 28 U.S.C. §1331.

16.    Venue is proper in this District pursuant to §22 of the 1933 Act, 15 U.S.C. §77v; §27 of the 1934 Act, 15 U.S.C. §78aa; and 28 U.S.C. §1391(b), (c), and (d).  Many of the acts and transactions described herein, including the preparation and dissemination of materially false and misleading public filings, occurred in this District.  At all times relevant, Lehman maintained operations and offices in this District.

17.    In connection with the acts alleged herein, defendants used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of national securities exchanges.

### PARTIES

18.    Plaintiff CalPERS is the largest public employee retirement system in the United States, with assets of approximately $218 billion and nearly 1.6 million beneficiaries, including active and retired public employees.  CalPERS purchased Lehman securities as described below and

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS    

was damaged thereby.  CalPERS purchased the following Lehman common stock and notes (the "Lehman Notes") during the Relevant Period:

| | |
|---|---|
| Lehman Common Stock | 3,893,586 shares |
| Lehman Brothers Holdings Inc. 7.50% Subordinated Notes Due 2038 | $341,075,000 |
| Lehman Brothers Holdings Inc. 6.875% Subordinated Notes Due 2037 | $176,000,000 |
| Lehman Brothers Holdings Inc. 6.75% Subordinated Notes Due 2017 | $775,000 |
| Lehman Brothers Holdings Inc. 6.50% Subordinated Notes Due 2017 | $101,140,000 |
| Lehman Brothers Holdings Inc. Medium Term 7% Notes Due September 27, 2027 | $81,000,000 |
| Lehman Brothers Holdings Inc. Medium Term 5.625% Notes Due January 24, 2013 | $3,300,000 |

**Relevant Non-Parties**

19.     Lehman was a corporation organized under the laws of the state of Delaware with its headquarters located at 1271 Avenue of Americas, New York, New York.  Lehman operated as a global investment bank and purported to be "an innovator in global finance" with a "leadership position in equity and fixed income sales, trading and research."  Lehman's common stock  traded on the New York Stock Exchange.  On September 15, 2008, Lehman filed a voluntary petition for bankruptcy protection under Chapter 11 of the Bankruptcy Code. For this reason, Lehman is not named as a defendant in this action.

20.     LBI, based in New York, New York, was a wholly-owned subsidiary of Lehman and operated as a registered broker-dealer under the 1934 Act.  LBI's services included brokerage, mergers and acquisitions and restructuring advice, debt and equity underwriting, market making, debt and equity research, and real estate and private equity investments. On September 17, 2008, the Securities Investor Protection Corporation moved for an order commencing liquidation and protection under the automatic stay provisions of the Bankruptcy Code.  The Bankruptcy Court

1   granted the request on September 19, 2008.  For this reason, LBI is not named as a defendant in this

2   action.

3   **Defendants**

4          21.     Defendant Fuld had served as the Chairman of the Board of Directors and Chief

5   Executive Officer ("CEO") of Lehman since 2000.  Fuld received $111.8 million from fiscal year

6   ("FY") 2003 to FY 2007 in salary, bonuses and restricted stock unit awards, including $3.75 million

7   in salary, $36.9 million in bonuses and $71.2 million in restricted stock unit awards.  Fuld's bonus

8   amount was a substantial portion of his compensation as it was nearly ten times his base salary.

9   Additionally, Fuld received $190.8 million in insider trading proceeds from FY 2003 through FY

10  2007.  Fuld signed the Registration Statement.

11         22.     Defendant Christopher M. O'Meara ("O'Meara") served as the Company's Chief

12  Financial Officer ("CFO"), Controller and Executive Vice President from 2004 until December 1,

13  2007, when he assumed the role of Global Head of Risk Management.  O'Meara received $12.4

14  million from FY 2005 to FY 2007 in salary, bonuses and restricted stock unit awards, including

15  $600,000 in salary, $4.8 million in bonuses and $6.7 million in restricted stock unit awards.

16  O'Meara's bonus amount was a substantial portion of his compensation as it was eight times his base

17  salary.  Additionally, O'Meara received $1.2 million in insider trading proceeds from FY 2003

18  through FY 2007.  O'Meara signed the Registration Statement.

19         23.     Defendant Erin M. Callan ("Callan") served as the Company's CFO, Controller and

20  Executive Vice President from December 2007 until June 2008.  Callan resigned from the Company

21  in July 2008.  Previously, Callan served in various positions at Lehman after joining the Company in

22  1995.

23         24.     Defendant Michael L. Ainslie ("Ainslie") was a director of Lehman during the

24  Relevant Period.  Ainslie signed the Registration Statement.

25         25.     Defendant John F. Akers ("Akers") was a director of Lehman during the Relevant

26  Period.  Akers signed the Registration Statement.

27         26.     Defendant Roger S. Berlind ("Berlind") was a director of Lehman during the

28  Relevant Period.  Berlind signed the Registration Statement.

27.     Defendant Thomas H. Cruikshank ("Cruikshank") was a director of Lehman during the Relevant Period.  Cruikshank was also a director of LBI.  Cruikshank signed the Registration Statement.

28.     Defendant Marsha Johnson Evans ("Evans") was a director of Lehman during the Relevant Period.  Evans signed the Registration Statement.

29.     Defendant Sir Christopher Gent ("Gent") was a director of Lehman during the Relevant Period.  Gent signed the Registration Statement.

30.     Defendant Roland A. Hernandez ("Hernandez") was a director of Lehman during the Relevant Period.  Hernandez signed the Registration Statement.

31.     Defendant Henry Kaufman ("Kaufman") was a director of Lehman during the Relevant Period.  Defendant Kaufman signed the Registration Statement.

32.     Defendant John D. Macomber ("Macomber") was a director of Lehman from 1996 until Lehman's bankruptcy on September 15, 2008.  Defendant Macomber signed the Registration Statement.

33.     The defendants identified in ¶¶21-23 are referred to herein as the "Officer Defendants."

34.     The defendants identified in ¶¶21 and 24-32 are referred to herein as the "Director Defendants."

35.     Defendant Cabrera Capital Markets, LLC ("Cabrera") is an investment bank and full-service institutional brokerage firm which provides services worldwide to a substantial and diversified client base that includes financial institutions, unions, governments, corporations, hedge funds, and foundations/endowments.  Cabrera is based in Chicago, Illinois.  Cabrera was an underwriter of the 7.50% Notes offering and the 7.0% Notes offering.

36.     The Williams Capital Group, L.P. ("Williams Capital") is an investment bank providing institutional investors and corporate, governmental, and municipal clients with products and services in equities, fixed income, corporate finance, investment management and private equity. Williams Capital is based in New York, New York.  Williams Capital was an underwriter of the 7.50% Notes offering.

37.     Defendant Loop Capital Markets, LLC ("Loop") is a boutique investment banking and brokerage firm.  The firm offers corporate and public finance, financial advisory, municipal finance, equity research, and securities sales and trading services.  Loop is based in Chicago, Illinois. Loop was an underwriter of the 7.50% Notes offering.

38.     Defendant BBVA Securities Inc. ("BBVA") is a security broker/dealer which provides securities brokerage and research services.  BBVA is based in New York, New York. BBVA was an underwriter of the 6.875% Notes offering, the 6.75% Notes offering, the 7% Notes offering and the 5.625% Notes offering.

39.     Defendant BNY Capital Markets, Inc. ("BNY") is a boutique investment banking firm that offers corporate finance advisory services and fixed-income securities.  BNY is a subsidiary of The Bank of New York Mellon Corporation.  BNY was an underwriter of the 6.875% Notes offering and the 6.75% Notes offering.

40.     Defendant Citigroup Global Markets Inc. ("CGMI") is a large integrated financial services institution that through subsidiaries and divisions provides commercial and investment banking services, commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities.  CGMI was an underwriter of the 6.875% Notes offering, the 6.75% Notes offering, the 5.625% Notes offering and the 7% Notes offering.

41.     Defendant RBC Capital Markets Corporation ("RBC Capital") offers corporate and investment banking services to corporations, governments, and institutions.  The firm's services include public and private placement of debt and equity securities, strategic alliances, mergers and acquisitions advice, corporate finance, equity and debt underwriting, and structured and project finance.  RBC Capital is based in Toronto, Canada.  RBC Capital was an underwriter of 6.875% Notes offering.

42.     Defendant Greenwich Capital Markets, Inc. ("Greenwich"), now-known as RBS Securities, Inc., is the Royal Bank of Scotland Group's U.S. investment bank/broker-dealer that specializes in fixed income arbitrage and other fixed income strategies.  Greenwich is based in Stamford, Connecticut.  Greenwich was an underwriter of the 6.875% Notes offering.

43. Defendant SunTrust Capital Markets, Inc. ("SunTrust") is a full-service investment banking and capital markets company that provides capital raising, strategic advisory, risk management, and investment solutions to corporate clients across the nation. SunTrust was an underwriter of the 6.875% Notes offering, the 7% Notes offering and the 5.625% Notes offering.

44. Defendant ABN AMRO Inc. ("ABN") provides investment advice and related services regarding securities, fixed income, and futures products. ABN provides its services to financial institutions, corporations, governments, fiduciaries, individual investors, professional investors, and securities and commodities dealers. ABN operates as a subsidiary of ABN AMRO Bank N.V. ABN was an underwriter of the 6.75% Notes offering.

45. Defendant ANZ Securities, Inc. ("ANZ") is a boutique investment banking firm that offers financial advisory services. The firm provides merger and acquisition, trade finance, export finance, structured finance, corporate banking, currency options, and structured credit derivatives. ANZ operates as a subsidiary of ANZ Bank based in Melbourne, Australia. ANZ is headquartered in New York, New York. ANZ was an underwriter of the 6.75% Notes offering and the 7% Notes offering.

46. Defendant CIBC World Markets Corp. ("CIBC") is the investment banking subsidiary of the Canadian Imperial Bank of Commerce. The firm operates as an investment bank both in the domestic and international equity and debt capital markets. CIBC is headquartered in Toronto, Ontario. CIBC was an underwriter of the 6.75% Notes offering.

47. Defendant HSBC Securities (USA) Inc. ("HSBC") is an investment banking firm that provides financial advisory services. The firm's services include mergers and acquisitions, capital raising, privatization, and strategic advice. HSBC operates as a subsidiary of HSBC Investments (North America) Inc. HSBC was an underwriter of the 6.75% Notes offering and the 6.50% Notes offering.

48. Defendant HVB Capital Markets, Inc. ("HVB") is a securities broker/dealer. HVB was an underwriter of the 6.75% Notes offering and the 6.50% Notes offering.

49. Defendant Caja de Ahorros y Monte de Piedad de Madrid ("Caja Madrid") operates as a savings bank in Spain. It primarily offers products and services in banking, insurance, and asset

1  management and brokerage sectors.  Caja Madrid provides an array of products and services,

2  including guarantees, credit lines, loans, leasing products, bill discounting, mutual funds, factoring,

3  customized financing, financial advice, and foreign trade operations.  Caja Madrid was an

4  underwriter of the 6.50% Notes offering.

5       50.    Defendant National Australia Capital Markets, LLC ("NACM") is a securities

6  broker/dealer.  NACM was an underwriter of the 6.50% Notes offering.

7       51.    Defendant Santander Investment Securities Inc. ("Santander") is a securities and

8  money management firm that offers full securities brokerage services, including retail and

9  institutional sales, trading, investment banking, asset management and research.  Santander is the

10  U.S. retail securities broker-dealer arm of Grupo Santander, the largest financial group in Spain and

11  Latin America.  Santander was an underwriter of the 6.50% Notes offering.

12       52.    Defendant BNP Paribas S.A. ("BNP") is a France-based bank group with operations

13  throughout the world.  BNP was an underwriter of the 5.625% Notes offering.

14       53.    Defendant ING Financial Markets LLC ("ING") offers investment banking and

15  corporate financial services.  ING is based in New York, New York and operates as a subsidiary of

16  ING Groep NV.  ING was an underwriter of the 5.625% Notes offering.

17       54.    Defendant Mellon Financial Markets, LLC ("Mellon") is an investment banking and

18  full-service securities dealer firm specializing in public finance, asset-backed finance and

19  institutional sales, servicing hundreds of institutional client.  Mellon was an underwriter of the

20  5.625% Notes offering and the 7% Notes offering.

21       55.    Defendant M.R. Beal & Company ("MR Beal") is a full-service investment banking

22  firm, which includes public finance, corporate debt and equity, fixed-income sales and trading, and

23  financial advisory services.  MR Beal was an underwriter of the 5.625% Notes offering.

24       56.    Defendant Natexis Bleichroeder Inc. ("Natexis") provides securities brokerage, equity

25  trading, and research services to individuals, corporations, and institutional investors.  Natexis offers

26  corporate finance services, including mergers and acquisitions, divestitures, and investment advice.

27  Natexis is headquartered in New York, New York.  Natexis was an underwriter of the 5.625% Notes

28  offering.

57. Defendant SG Americas Securities, LLC ("SG Americas") provides investment banking services. It focuses on capital markets, securities, underwriting, mergers and acquisitions, derivatives, and trading services. SG Americas is based in New York, New York and operates as a subsidiary of Societé Generale Group. SG Americas was an underwriter of the 5.625% Notes offering.

58. Defendant Wells Fargo Securities, LLC ("Wells Fargo") is an investment services division of Wells Fargo Bank. Wells Fargo provides investment banking services in the United States and offers capital markets access through public offerings, private placements, and debt offerings, which include new issue underwriting of high yield bonds and 144A private placements, as well as market making, research, and equity trading. Wells Fargo also provides advisory services for mergers and acquisitions. Wells Fargo was an underwriter of the 5.625% Notes offering and the 7% Notes offering.

59. Defendant Wachovia Capital Markets, LLC ("Wachovia"), which became part of defendant Wells Fargo in 2009, provides debt and equity underwriting, mergers and acquisitions, loan syndications, debt and equity sales and trading, tax-exempt products, research and economics, and certain hedging products such as equity derivatives. Wachovia was an underwriter of the 6.75% Notes offering.

60. Defendant Harris Nesbitt Corp. ("Harris Nesbitt") an investment bank, provides investment and corporate banking services in the United States. It offers various financial products and services, including equity and debt underwriting, corporate lending and project financing, merger and acquisitions advisory services, merchant banking, securitization, treasury and market risk management, debt and equity research and institutional sales and trading. Harris Nesbitt is headquartered in New York, New York. Harris Nesbitt was an underwriter of the 7% Notes offering.

61. Defendant DZ Financial Markets LLC ("DZ Financial") provides securities brokerage and underwriting services and is based in New York, New York. DZ Financial was an underwriter of the 7% Notes offering

1      62.    Defendant Mizuho Securities USA Inc. ("Mizuho") offers underwriting, sales and

2 trading of securities and is a financial derivatives brokerage. Mizuho is based in New York, New

3 York and operates as a subsidiary of Mizuho Securities Co., Ltd. Mizuho was an underwriter of the

4 7% Notes offering.

5      63.    Defendant Scotia Capital (USA) Inc. ("Scotia") is a wholly owned subsidiary of

6 Scotia Capital Inc., which offers multi-product solutions to clients' financial needs in the United

7 States. Additionally, it offers mergers and acquisitions advisory, private placement, negotiation

8 assistance, due diligence, and restructuring services and provides research, equity sales and trading.

9 Scotia was an underwriter of the 7% Notes offering.

10      64.    Defendant Sovereign Securities Corporation, LLC ("Sovereign") is a security

11 brokerage firm. The firm underwrites municipal debt focusing on short-term instruments such as tax

12 bond, and tax and revenue anticipatory notes. Additionally, Sovereign advises, structures,

13 underwrites, and services the needs of issuers of taxable and tax exempted debt. Sovereign is

14 headquartered in Philadelphia, Pennsylvania and operates as a subsidiary of Santander Holdings

15 USA, Inc. Sovereign was an underwriter of the 7% Notes offering.

16      65.    Defendant Utendahl Capital Partners, L.P. ("Utendahl") is a boutique investment

17 bank. Utendahl's products and services include underwriting and trading of fixed-income, equity

18 and convertible securities, general corporate finance, structured finance, mergers and acquisitions

19 and asset management. Utendahl was acquired by Williams Capital on or about January 10, 2010.

20 Utendahl was an underwriter of the 7% Notes offering.

21      66.    Defendant Fortis Securities LLC ("Fortis") is an integrated financial services provider

22 engaged in providing business support services. Fortis was an underwriter of the 5.625% Notes

23 offering.

24      67.    Defendant Muriel Siebert & Co., Inc. ("Muriel Siebert") is a stock discount brokerage

25 firm which traded in municipal bonds, government agency bonds, corporate bonds and equities.

26 Muriel Siebert was an underwriter of the 6.75% Notes offering.

27      68.    Defendant Daiwa Securities SMBC Europe Limited ("Daiwa") is an investment

28 banking firm that provides equity, fixed income, investment banking, derivatives, and strategic

advisory services.  The firm also underwrites and manages new issues, and carries out trading and sales of secondary securities.  Daiwa Securities SMBC Europe Limited changed its name to Daiwa Capital Markets Europe Limited in January 2010.  Daiwa was an underwriter of the 5.625% Notes offering and the 7% Notes offering.

69.     The defendants referenced in ¶¶35-68 above are referred to herein as the "Underwriter Defendants."

70.     The Underwriter Defendants are liable for the false and misleading statements in the Registration Statement.  In connection with the Offerings, the Underwriter Defendants drafted and disseminated the Registration Statement and were paid fees in connection therewith.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS WITH RESPECT TO THE 1934 ACT CLAIMS

71.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Lehman's business and financial results.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on plaintiff was a success, as it: (i) deceived plaintiff regarding Lehman's prospects and business; (ii) artificially inflated the prices of Lehman securities; and (iii) caused plaintiff to purchase Lehman securities at inflated prices.

## BACKGROUND

72.     Lehman was an integrated financial services institution that provided commercial and investment banking services, commercial loans to corporate entities, and acted as an underwriter in the sale of corporate securities.  Lehman is not a named defendant in this lawsuit due to its filing, on September 15, 2008, for bankruptcy protection under Chapter 11 of the Bankruptcy Code.  Similarly, LBI is not a named defendant in this lawsuit due to its forced dissolution on September 19, 2008. LBI was wholly owned by Lehman and was Lehman's primary broker-dealer subsidiary.

73.     The 158-year-old firm had its roots in a dry-goods store in Montgomery, Alabama.  In 1850, the newly formed Lehman Brothers began accepting raw cotton as payment for its merchandise and later began trading the cotton.  As the Company's cotton trading business grew,

1   Lehman moved its headquarters to New York and began to focus on its commodities/brokerage

2   business, including helping to launch the cotton commodities exchange.  Initially, Lehman continued

3   to focus on commodities such as cotton and coffee and later diversified to become a full-fledged

4   investment bank.

5           74.     In 1984, American Express purchased Lehman in the midst of a power struggle

6   between the Company's traders and its investment bankers over the direction of the Company.  At

7   the time, defendant Fuld sided with the firm's traders.  Under American Express's direction,

8   Lehman's operations were scaled back and it became known as a stodgy old bond-trading house.

9           75.     In 1994, Lehman became a public company once again after being spun off from

10  American Express with defendant Fuld at the helm.  As CEO, defendant Fuld was determined to

11  diversify the firm away from being a second-tier bond-trading shop and turn it into a full service

12  investment bank.  Fuld, known as "The Gorilla" of Wall Street given his relentless style, steered the

13  Company into the budding mortgage-backed securities market and eventually deep into risky

14  subprime and Alt-A mortgages.

15          76.     The decision initially paid off and Lehman soon became one of the dominant players

16  in the real estate market, being engaged in all aspects of the mortgage market from originating the

17  mortgages to securitization of the loans.  Through its subsidiaries, Aurora and BNC, Lehman was

18  one of the ten largest mortgage lenders in the U.S.  These subsidiaries in turn sold nearly all of their

19  loans to Lehman, making Lehman one of the largest issuers of mortgage-backed securities.  From

20  2004 to 2007, Lehman securitized $480 billion in mortgages, with Aurora originating one third of

21  the securitized loans and BNC originating another 20% of them.

22          77.     Lehman's real estate activities and in particular the fees generated from the sale of its

23  mortgage-backed securities helped the Company report record earnings in 2005, 2006 and 2007.

24  Sales in its capital markets business segment, which included its mortgage origination and

25  securitization activities, increased 56% from 2004 to 2006, a faster growth rate than in Lehman's

26  two other business segments.

27          78.     Nonetheless, in order to continue fueling the unprecedented growth, Lehman began

28  employing high-risk, deceptive lending practices in originating subprime and Alt-A loans at least as

early as 2004 and continuing through 2007.  These high-risk loans were then bundled together into mortgage-backed securities and either sold to investors or held by Lehman if it was unable to sell them on.

79.     In addition, due to an SEC change which relaxed the rule limiting the amount of leverage that Lehman and other investments banks were allowed to use, Lehman substantially increased its use of leverage to fund its real estate investment activities beginning in 2004.  The increase in leverage aggravated Lehman's risk exposure making it more vulnerable to deteriorations in the real estate market.

80.     Partly as a result of Lehman's mortgage-related risks and increasing exposure to risky subprime and Alt-A mortgages and its dramatic increase in its reliance on leverage, Lehman collapsed into bankruptcy in September 2008.  Statements made by defendants from at least 2006 through mid-September 2008, including statements made in the Offering Documents prepared, reviewed and/or disseminated by defendants, failed to adequately disclose the Company's mortgage-related activities and exposures, and the risks associated with these activities and exposures.

**Mortgage Origination Business**

81.     The Offering Documents and subsequent Lehman statements were false and misleading as to Lehman's mortgage origination business in that the statements failed to disclose that Lehman had employed high risk lending practices in originating subprime and Alt-A loans and the true risks associated with its aggressive mortgage practices.

82.     In order to fuel its securitization pipeline, the Officer Defendants caused Lehman to provide a great deal of assistance to aggressive mortgage lending companies.  Lehman would provide the mortgage companies with assistance in going public.  Lehman would further provide these companies with warehouse lines of credit in order for the companies to be able to originate loans to home buyers.  Lehman would then buy the loans originated with its lines of credits from the mortgage companies and bundle them into securities to resell to investors.  Many of these loans were issued by questionable lenders, such as First Alliance – a mortgage lender that collapsed in 2000 due

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1    to its deceptive mortgage practices.[2]   Nonetheless, Lehman continued to do business with these

2    lenders in order to meet the demand for its securitizations.

3          83.    Later, as the market for mortgage-backed securities continued to grow, the Officer

4    Defendants caused Lehman to purchase interests in mortgage lending companies in order to meet its

5    ever increasing demand for real estate loans.  In 2003 and 2004, with the housing boom underway,

6    Lehman acquired five mortgage lenders, including Alt-A lender Aurora and subprime lender BNC.

7          84.    In many instances, the borrowers or brokers inflated the income reported on stated-

8    income loans or "liar loans."  The brokers and mortgage bankers had every incentive to make the

9    loans, as they were paid generously whether the loan later went into default or not.  Many of the

10   borrowers accepted risky loans with no money down and loans with low "teaser" interest rates,

11   knowing that they would be unable to make the payments once the interest rates reset.  Nonetheless,

12   the borrowers were told they would easily be able to refinance or sell the property at the time of the

13   reset as real estate prices were continuing to rise.

14         85.    As a result, the Alt-A market grew substantially from $190 billion in 2004 to $400

15   billion in 2006.  The Officer and Director Defendants were fully aware of the risk practices being

16   employed by Aurora but permitted them to continue in order to continue obtaining loans for the

17   Company's lucrative securitization transactions.  An article in *The Globe and Mail* dated December

18   22, 2008, entitled "Lehman's Rise and Fall," provided in pertinent part:

19            Mark Golan was getting frustrated as he met with a group of auditors from
          Lehman Brothers.

20            It was spring, 2006, and Mr. Golan was a manager at Colorado-based Aurora
          Loan Service LLC, which specialized in "Alt A" loans, considered a step above

21        subprime lending.  Aurora had become one of the largest players in that market,
          originating $25-billion worth of loans in 2006. It was also the biggest supplier of

22        loans to Lehman for securitization.

23            Lehman had acquired a stake in Aurora in 1998 and had taken control in
          2003.  *By May, 2006, some people inside Lehman were becoming worried about*

24        *Aurora's lending practices*.  The mortgage industry was facing scrutiny about

25    _____

26    [2]     In a California class-action case, a jury reached a verdict in June 2003, finding Lehman
      partially responsible for First Alliance's conduct and ordering the Company to pay $5 million in

27    damages.

28

billions of dollars worth of Alt-A mortgages, also known as "liar loans"– because they were given to people with little or no documentation. In some cases, borrowers demonstrated nothing more than "pride of ownership" to get a mortgage.

> *That spring, according to court filings, a group of internal Lehman auditors analyzed some Aurora loans and discovered that up to half contained material misrepresentations.  But the mortgage market was growing too fast and Lehman's appetite for loans was insatiable.  Mr. Golan stormed out of the meeting, allegedly yelling at the lead auditor: "Your people find too much fraud*."

86.     Beginning in 2006 (the same time as the Offering Documents were being prepared), cracks began to show in the mortgage market.  Lehman's own traders saw signs of trouble in the housing market and in late 2006 even began to bet against the price of home loans.  Nonetheless, Aurora continued its risky lending practices and continued making Alt-A loans, although at a somewhat lower level, throughout 2007.  It was not until January 2008 that Lehman suspended its wholesale and correspondent lending activities at Aurora.

**Mortgage Securitization Business**

87.     The Officer Defendants concealed that Lehman had failed to engage in proper due diligence in securitizing high risk loans.  The Officer Defendants further caused Lehman to fail to properly value its mortgage-related assets.

88.     The high demand for and the lucrative fees generated by Lehman's mortgage securitization practice fueled its high risk mortgage origination activities as Lehman needed more and more loans in order to continue putting together mortgage-backed securities at increasing rates. Similar to the compensation system in place in Lehman's mortgage origination practice, the compensation in its mortgage securitization practice was paid based on how many mortgage-backed securities were put out every year, thus providing incentives to not engage in proper due diligence in assessing the quality of the loans underlying the securitized transactions.

89.     In connection with some of its securitization transactions, Lehman would often hold onto certain of the lower-rated/higher-risk tranches of its mortgage-backed securitization transactions if it was unable to sell the higher risk slices to other investors or if it wanted to add to its own investment returns.

90.     Beginning in late 2006, as default rates on subprime loans spiked, the securitization market began to dry up.  By August 2007, investors' appetite for these securities was diminished

1   significantly.  As a result, Lehman began to accumulate additional large amounts of Alt-A mortgages

2   and mortgage-backed assets.  However, Lehman failed to properly write down those assets as their

3   value declined.  Indeed, Lehman's failure to properly write down its Alt-A and mortgage-related

4   exposure is illustrated by the much larger write-downs recorded by its peers in the same time period

5   with regard to similar assets.

6        91.     For example, in the third quarter of 2007, Merrill Lynch recorded a $7.9 billion write-

7   down against $28.8 billion of certain mortgage-related securities, while UBS wrote down roughly

8   $3.7 billion of its $19 billion in mortgage-backed securities.  In comparison, Lehman took a net

9   write-down of $700 million in the same quarter against its $88 billion in mortgage-related holdings.

10       92.     In the fourth quarter of 2007, Citigroup wrote down $17.4 billion against $44.4

11  billion in subprime-related assets and Merrill Lynch wrote down $11.5 billion against $28.9 billion

12  in such assets.  In the same quarter, Lehman took a total net write-down of only $1.5 billion on its

13  mortgage- and asset-backed holdings of over $70 billion.  Thus, while Citigroup's and Merrill

14  Lynch's write-downs equaled 39% and 40% of their respective subprime assets, Lehman wrote

15  down only 2% of its subprime assets.

16       93.     Finally, on September 10, 2008, Lehman pre-announced a staggering $7 billion gross

17  write-down of its mortgage-related holdings for the third quarter of 2008, stating: "The majority of

18  our write-downs were in Alt-A driven by an increase in Alt-A delinquencies and loss expectations

19  which were specific to Alt-A prices . . . ."

20       94.     The failure to timely write down the impaired Alt-A assets was due in part to

21  improper shifts in large amounts of Lehman's mortgage assets into the Level 3 accounting category

22  in order to avoid writing them down, which overstated the value of Lehman's Alt-A assets and

23  inflated certain real estate and mortgage holdings far above what many were sold for shortly

24  thereafter.

25       95.     Level 2 assets are valued using, *inter alia*, objective market data such as the market

26  prices of  mortgage-related assets as reflected in the ABX and CMBX indices.  In contrast, Level 3

27  assets are valued at management's discretion using internal models instead of objective market data.

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1  By improperly categorizing assets as Level 3 and by using inappropriate models to inflate the
2  reported values of those assets, Lehman reported inflated values for billions of dollars in assets.

3      96.    During 2007, the ABX index declined significantly, as did the CMBX.  As a result,
4  Level 2 assets that had to be valued in relation to market prices should have been marked down
5  accordingly.  Instead of doing so, however, Lehman improperly recategorized large swaths of assets
6  as Level 3 and maintained their inflated valuations using models instead of market prices.  Indeed,
7  the percentage of mortgage- and asset-backed securities Lehman categorized as Level 3 increased
8  from $20.8 billion (12.5%) in the second quarter of 2007 to $37.9 billion (28%) a year later.  This
9  shift allowed Lehman to avoid huge write-downs that would otherwise have been required due to the
10 decline in market prices for mortgage-related assets.

11 **Commercial and Other Real Estate Holdings**

12     97.    In addition to Lehman's lending and securitization activities, Lehman also held
13 investments in commercial and other types of real estate-related assets.  As the real estate market
14 declined, Lehman further suffered substantial losses in it commercial real estate portfolio. Lehman
15 was required to "mark to market" its commercial real estate holdings, meaning to value the assets at
16 the level at which they could be sold right away.  Nonetheless, the defendants failed to aggressively
17 mark down the value despite the substantial decline in Lehman's portfolio, causing Lehman's
18 portfolio to be vastly overstated.

19     98.    In late August/early September 2008, Lehman sought to extricate itself from its toxic
20 commercial real estate by selling it to an outside investor.  Lehman approached Barclays, Bank of
21 America, Goldman Sachs and Credit Suisse to consider purchasing the Company's commercial real
22 estate portfolio.   Upon review of Lehman's internal documents, executives at several of the
23 companies were able to quickly surmise that the portfolio was substantially overvalued.  As a result,
24 Lehman remained unable to find a buyer for its troubled portfolio.

25     99.    On October 6, 2008, *The Wall Street Journal* reported on the results of negotiations
26 concerning the sale of Lehman and/or some of its assets.  According to Lehman documents reviewed
27 in connection with the article by *The Wall Street Journal*, Lehman reported the value of its
28 commercial real estate holdings to be $32.6 billion at the time.  According to several Wall Street

1   executives who reviewed Lehman's documents and analyzed the valuations, they believed the

2   portfolio to be overstated by as much as 35%.   Lehman further reported the value of certain

3   European real estate loans at nearly $0.98 on the dollar, but valued substantially similar U.S. assets

4   at only $0.56 on the dollar.  While the European real estate market had been slightly better than the

5   U.S. market, it had also suffered substantial declines.   As a result of these and other inflated

6   valuations, no suitors for Lehman or its assets were found.  Further, neither the U.S. Federal Reserve

7   nor the Treasury would agree to bail Lehman out in part due to similar over-valuations.

8         100.   One example of the type of risky real estate deals that Lehman was involved in was

9   bridge equity financing.  Bridge equity financing involves equity or short-term debt financing raised

10  within 6 to 18 months of an anticipated deal.  It is temporary financing, as it is meant to "bridge" a

11  company to the next round of financing.   Typically bridge financing deals have been used by

12  companies just prior to going public or just prior to completing a private placement transaction.

13        101.   While Lehman had been engaged in bridge equity transactions since the mid-90s,

14  Lehman's use of these types of deals increased substantially beginning in 2003.  Lehman engaged in

15  bridge equity financing transactions in the real estate context by allowing real estate developers to

16  purchase commercial real estate property with financing from Lehman's bridge equity transactions.

17  The fees associated with these types of deals were lucrative as they were twice the amount of the

18  fees earned by a loan securitization transaction, and bridge equity deals soon became a signature

19  product for the Company.   Nonetheless, while these deals did provide Lehman with a good return,

20  they also provided Lehman with increased risks and exposure to the commercial real estate market.

21        102.   Another example was Lehman's deal to purchase Archstone-Smith Trust

22  ("Archstone"), an owner of residential apartment buildings.  Despite the obvious cracks in the real

23  estate market, Lehman persisted and closed the deal in October 2007.  The $22 billion transaction

24  only required the purchaser to put up $250 million of its own equity.  The remaining portion was put

25  up by Lehman and Bank of America, in a 50-50 partnership, involving $17.1 billion in debt and $4.6

26  billion in bridge equity financing.  Lehman sold off portions of its exposure but in the end it was left

27  with a $5.4 billion exposure.

28

**Leverage Exposure**

103.    Lehman further took on additional unnecessary risks by significantly increasing its leverage exposure.  Leverage is the total ratio of assets to shareholder value.  It involves using borrowed funds or debt to increase returns to equity.  The Company leveraged its net assets by borrowing money using its assets as collateral and then using the proceeds to pursue its high risk real estate investments.  While the use of leverage greatly increases a company's potential gain from an investment, it also greatly increases a company's potential loss as the company is exposed to loss on its new investments in addition to loss associated with its original assets.  Moreover, the use of off-balance-sheet vehicles to create leverage may conceal from investors the full extent of a company's risk exposure.

104.    In 2004, the SEC relaxed a rule limiting the amount of leverage that Lehman and other investments banks were allowed to use.  Previously, longstanding SEC rules required banks to limit their debt-to-net capital ratio to 15-to-1, meaning that for every $15 of debt, the banks were required to have $1 of equity.  Nonetheless, in 2004, the SEC relaxed the minimum capital requirement for investment banks that voluntarily participated in a program in exchange for the participating banks agreeing to additional SEC oversight of their broker-dealer and holding company operations.  Lehman and the other large investment banks voluntarily agreed to the program.

105.    As a result, Lehman's use of leverage greatly increased.  Between 2004 and 2007, Lehman's balance sheet increased by almost $300 billion through the purchase of securities often backed by residential and commercial real estate loans.  During the same time frame, the firm only added $6 billion in equity.  The increased use of leverage added to Lehman's achieving four years of record breaking financial results.

106.    Nonetheless, Lehman's use of leverage made it vulnerable to declines in the value of its assets.  As the real estate market imploded, Lehman's leverage began to consume a substantial amount of its capital.  By early 2008, Lehman's leverage was still more than 30-to-1, meaning a decline of only 3.3% in the value of its assets could wipe out the entire value of the Company's equity and make the Company insolvent.

107.    Moreover, Lehman's leverage risk was exacerbated by its use of short-term debt financing.  While short-term debt is cheaper than long-term debt and thus provides a company with greater profit potential, strong reliance on short-term debt creates additional risks as the short-term debt needs to be constantly refinanced, including the risk of a bank run when a financial institution is rumored to be insolvent.

108.    More than 50% of Lehman's assets were financed by short-term borrowings.  Given a large amount of Lehman's assets were tied up in illiquid mortgage-related securities due to the subprime mortgage crisis, Lehman was unable to sell its assets except at a substantial loss.  This caused pressure on Lehman as the credit markets tightened up and the Company began having trouble rolling over its short-term debt.

109.    In early September 2008, as rumors persisted about Lehman's solvency, many of the firm's hedge fund clients began to pull large amounts of money out of the Company at a rapidly increasing pace.  In addition, on September 11, 2008, J.P. Morgan Chase & Co. ("J.P. Morgan"), who acted as the financial middleman between Lehman and many of its clients, demanded Lehman provide J.P. Morgan with $5 billion in additional collateral to cover lending positions that J.P. Morgan's clients had with Lehman.  Due to its inability to obtain new financing, the Company was so weakened by the cash outflows that it filed for bankruptcy four days later, unable to cover many of its outstanding collateral positions.

**THE FALSE AND DEFECTIVE REGISTRATION STATEMENT AND PROSPECTUSES**

110.    On or about May 30, 2006, Lehman filed with the SEC a Form S-3 Registration Statement and Prospectus (the "Registration Statement") using a "shelf" registration or continuous offering process.  Under the shelf, Lehman would be permitted to sell securities described in the subsequently issued Prospectuses in one or more offerings up to a total dollar amount of $2.75 billion.  The Prospectuses were part of the Registration Statement.  The securities were to be issued by Lehman.  The Registration Statement incorporated Lehman's Form 10-K for the fiscal year ended November 30, 2005:

> The SEC allows us to "incorporate by reference" the information it files with
> the SEC, which means that it can disclose important information to you by referring

you to those documents.  The information incorporated by reference is considered to be part of this prospectus.  Information that we file after the date of this registration statement and prior to the effecitveness [sic] of this registration statement shall be deemed to be incorporated by reference into this prospectus and information that we file later with the SEC will automatically update information in this prospectus.  In all cases, you should rely on the later information over different information included in this prospectus or the prospectus supplement or supplements.  We incorporate by reference the documents listed below and any future filings made with the SEC under Section 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1934 (other than information in the documents or filings that is deemed to have been furnished and not filed):

- Annual Report on Form 10-K for the year ended November 30, 2005;

- Quarterly Report on Form 10-Q for the quarter ended February 28, 2006;

- Current Reports on Form 8-K filed with the SEC on February 21, 2006, February 24, 2006, March 3, 2006, March 10, 2006 (two Form 8-K filings), March 15, 2006, March 16, 2006, March 24, 2006, March 28, 2006, March 31, 2006 (two Form 8-K filings), April 4, 2006, April 25, 2006, May 3, 2006 and May 24, 2006; and

- Registration Statement on Form 8-A, filed on April 29, 1994.

111.    The Registration Statement also incorporated by reference subsequently filed Prospectuses:

That, for the purpose of determining any liability under the Act, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

112.    The Registration Statement also included assurances that the registrant would reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the Registration Statement.

113.    Lehman's FY 2005 Form 10-K filed on February 13, 2006 and incorporated into the Registration Statement provided in the Management Discussion and Analysis ("MD&A") section as follows concerning the Company's mortgage-related activities:

**Capital Markets**

\*          \*          \*

Net revenues totaled $9.8 billion, $7.7 billion and $6.0 billion in 2005, 2004 and 2003, respectively.  Capital Markets net revenues in 2005 represent the seventh

consecutive year of record performance in Fixed Income and the second highest revenue level in Equities.  Fixed Income revenues rose 28% in 2005 compared with 2004 on improved client-flow activities, an increased contribution from the non-US regions and record revenues across a number of products. . . .  Fixed Income revenues improved in 2004 compared with 2003 as a favorable interest rate environment helped drive strength in mortgage originations and securitizations as well as interest rate products and the declining dollar drove higher foreign exchange activity. . . .

Fixed Income net revenues were a record $7.3 billion in 2005, increasing 28% compared with 2004 driven by double digit revenue increases from each geographic region and record revenues across a number of businesses including commercial mortgage and real estate, residential mortgage origination and securitization, and interest rate products.  Revenues from our commercial mortgage and real estate businesses increased substantially in 2005 reaching record levels, as the strong demand for commercial real estate properties, the recovery in certain property markets and relatively low interest rates drove asset sales and robust levels of securitizations.  ***Revenues from our residential mortgage origination and securitization businesses increased in 2005 from the robust levels in 2004, reflecting record volumes and the continued benefits associated with the vertical integration of our mortgage origination platforms***.  We originated approximately $85 billion and $65 billion of residential mortgage loans in 2005 and 2004, respectively.  We securitized approximately $133 billion and $101 billion of residential mortgage loans in 2005 and 2004, respectively, including both originated loans and those we acquired in the secondary market.  While the performance in our mortgage businesses reached record levels, these businesses were affected by somewhat lower levels of mortgage origination volumes and revenues in the U.S. in the latter half of 2005, partly offset by stronger volumes and revenues outside the U.S.  We originated approximately $27 billion and $13 billion of commercial mortgage loans in 2005 and 2004, respectively, the majority of which has been sold through securitization or syndication activities during both 2005 and 2004.  Interest rate product revenues increased in 2005 on higher activity levels, as clients repositioned portfolios in light of rising global interest rates and a flattening U.S. yield curve.  Credit product revenues also increased in 2005 as compared to 2004 driven by strength in both high yield and high grade credit products.  Fixed Income net revenues increased 31% in 2004 compared with 2003, reflecting generally favorable market conditions.  The mortgage securitization business was notably strong, with revenues in mortgage products benefiting from the low rate environment as well as the continued vertical integration of our mortgage origination platforms.

\*       \*       \*

***Mortgages, mortgage-backed and real estate inventory positions***.  Mortgages and mortgage-backed positions include mortgage loans (both residential and commercial), non-agency mortgage-backed securities and real estate investments.  We are a market leader in mortgage-backed securities trading.  We originate residential and commercial mortgage loans as part of our mortgage trading and securitization activities.  We originated approximately $85 billion and $65 billion of residential mortgage loans in 2005 and 2004, respectively.  We securitized approximately $133 billion and $101 billion of residential mortgage loans in 2005 and 2004, respectively, including both originated loans and those we acquired in the secondary market.  In addition, we originated approximately $27 billion and $13 billion of commercial mortgage loans in 2005 and 2004, respectively, the majority of which has been sold through securitization or syndicate activities during both 2005 and 2004.  See Note 3 to the Consolidated Financial Statements for additional

1   information about our securitization activities.  We record mortgage loans at fair
2   value, with related mark-to-market gains and losses recognized in Principal
    transactions in the Consolidated Statement of Income.

3        Management estimates are generally not required in determining the fair
4   value of residential mortgage loans because these positions are securitized
    frequently.  Certain commercial mortgage loans and investments, due to their less
5   liquid nature, may require management estimates in determining fair value.  Fair
    value for these positions is generally based on analyses of both cash flow projections
6   and underlying property values.  We use independent appraisals to support our
    assessment of the property in determining fair value for these positions.  Fair value
7   for approximately $3.6 billion and $3.8 billion at November 30, 2005 and 2004,
    respectively, of our total mortgage loan inventory is determined using the above
8   valuation methodologies, which may involve the use of significant estimates.
    Because a portion of these assets have been financed on a non-recourse basis, our net
9   investment position is limited to $3.5 billion and $2.9 billion at November 30, 2005
    and 2004, respectively.

10       We invest in real estate through direct investments in equity and debt.  We
11   record real estate held for sale at the lower of cost or fair value.  The assessment of
    fair value generally requires the use of management estimates and generally is based
12   on property appraisals provided by third parties and also incorporates an analysis of
    the related property cash flow projections.  We had real estate investments of
13   approximately $7.9 billion and $10.7 billion at November 30, 2005 and 2004,
    respectively.  Because significant portions of these assets have been financed on a
14   non-recourse basis, our net investment position was limited to $4.8 billion and $4.1
    billion at November 30, 2005 and 2004, respectively.

15       114.    The FY 2005 Form 10-K further provided in the MD&A section as follows

16   concerning Lehman's liquidity and risk management practices:

17   **Liquidity, Funding and Capital Resources**

18       Management's Finance Committee is responsible for developing,
19   implementing and enforcing our liquidity, funding and capital policies.  These
    policies include recommendations for capital and balance sheet size as well as the
20   allocation of capital and balance sheet to the business units.  Management's Finance
    Committee oversees compliance with policies and limits with the goal of ensuring we
    are not exposed to undue liquidity, funding or capital risk.

21   **Liquidity Risk Management**

22       We view liquidity and liquidity management as critically important to the
23   Company.  Our liquidity strategy seeks to ensure that we maintain sufficient liquidity
    to meet all of our funding obligations in all market environments.  Our liquidity
24   strategy is centered on five principles:

25        •    We maintain a liquidity pool available to Holdings that is of
             sufficient size to cover expected cash outflows over the next twelve
26           months in a stressed liquidity environment.

27        •    We rely on secured funding only to the extent that we believe it
28           would be available in all market environments.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

- • We aim to diversify our funding sources to minimize reliance on any given providers.

- • Liquidity is assessed at the entity level.  For example, because our legal entity structure can constrain liquidity available to Holdings, our liquidity pool excludes liquidity that is restricted from availability to Holdings.

- • We maintain a comprehensive Funding Action Plan that represents a detailed action plan to manage a stress liquidity event, including a communication plan for regulators, creditors, investors and clients.

*       *       *

**Risk Management**

As a leading global investment bank, risk is an inherent part of our business.  Global markets, by their nature, are prone to uncertainty and subject participants to a variety of risks.  The principal risks we face are credit, market, liquidity, legal, reputation and operational risks.  Risk management is considered to be of paramount importance in our day-to-day operations.  Consequently, we devote significant resources (including investments in employees and technology) to the measurement, analysis and management of risk.

While risk cannot be eliminated it can be mitigated to the greatest extent possible through a strong internal control environment.  Essential in our approach to risk management is a strong internal control environment with multiple overlapping and reinforcing elements.  We have developed policies and procedures to identify, measure, and monitor the risks involved in our global trading, brokerage and investment banking activities.  Our approach applies analytical rigor overlaid with sound practical judgment working proactively with the business areas before transactions occur to ensure appropriate risk mitigants are in place.

We also seek to reduce risk through the diversification of our businesses, counterparties and activities in geographic regions.  We accomplish this objective by allocating the usage of capital to each of our businesses, establishing trading limits and setting credit limits for individual counterparties.  Our focus is balancing risk versus return.  We seek to achieve adequate returns from each of our businesses commensurate with the risks they assume.  Nonetheless, the effectiveness of our approach to managing risks can never be completely assured.  For example, unexpected large or rapid movements or disruptions in one or more markets or other unforeseen developments could have an adverse effect on our results of operations and financial condition.  The consequences of these developments can include losses due to adverse changes in inventory values, decreases in the liquidity of trading positions, increases in our credit exposure to clients and counterparties and increases in general systemic risk.

Our overall risk limits and risk management policies are established by the Executive Committee.  On a weekly basis, our Risk Committee, which consists of the Executive Committee, the Chief Risk Officer and the Chief Financial Officer, reviews all risk exposures, position concentrations and risk-taking activities.  The Global Risk Management Division (the "Division") is independent of the trading areas and reports directly to the Firm's Chief Administrative Officer.  The Division

includes credit risk management, market risk management, quantitative risk management, sovereign risk management and operational risk management. Combining these disciplines facilitates a fully integrated approach to risk management. The Division maintains staff in each of our regional trading centers as well as in key sales offices. Risk management personnel have multiple levels of daily contact with trading staff and senior management at all levels within the Company. These discussions include reviews of trading positions and risk exposures.

115.     The FY 2005 Form 10-K did not specifically identify subsidiaries of the Company. The Form 10-K further failed to mention the term "Alt-A" and only made limited reference to the term "subprime" in connection with a discussion of the First Alliance class action referenced above.

116.     In addition, defendants Fuld, as CEO, and O'Meara, as CFO, as required by the securities laws, signed and filed certifications on behalf of themselves and Lehman with the SEC relating to Lehman's FY 2005 Form 10-K, which stated that the report was truthful, the financial statements in it were accurate and Lehman's internal disclosure and accounting controls were designed to be effective to detect and prevent fraud and had been tested and found to be effective.

117.     Lehman's Form 10-Qs for the first through third quarters of 2006, which were incorporated by reference into the Company's Registration Statement for the Offerings, contained substantially similar statements concerning the Company's mortgage operations, liquidity and risk management practices. The Form 10-Qs further failed to identify Aurora or BNC or to mention the terms Alt-A or subprime.

118.     In addition, defendants Fuld and O'Meara signed similar certificates contained in the Form 10-Qs for the first through third quarters of 2006 attesting to the accuracy of the financial statements and the effectiveness of Lehman's internal disclosure and accounting controls.

119.     On or about July 12, 2007, defendants caused Lehman to file a Prospectus Supplement to the May 30, 2006 Registration Statement, pursuant to the offering of 6.50% Subordinated Notes due 2017. CalPERS purchased $101,140,000 in these notes pursuant to the offering.

120.     On or about July 12, 2007, defendants caused Lehman to file a Prospectus Supplement to the May 30, 2006 Registration Statement, pursuant to the offering of 6.875%

1  Subordinated Notes due 2037.  CalPERS purchased $176,000,000 in these notes pursuant to the

2  offering.

3       121.    On or about September 19, 2007, defendants caused Lehman to file a Prospectus

4  Supplement to the May 30, 2006 Registration Statement, pursuant to the offering of Medium Term

5  7.0% Notes due 2027.  CalPERS purchased $81,000,000 in these notes pursuant to the offering.

6       122.    On or about December 17, 2007, defendants caused Lehman to file a Prospectus

7  Supplement to the May 30, 2006 Registration Statement, pursuant to the offering of 6.75%

8  Subordinated Notes due 2017.  CalPERS purchased $775,000 in these notes pursuant to the offering.

9       123.    On or about January 15, 2008, defendants caused Lehman to file a Prospectus

10  Supplement to the May 30, 2006 Registration Statement, pursuant to the offering of Medium Term

11  5.625% Notes due 2013.  CalPERS purchased $3,300,000 in these notes pursuant to the offering.

12       124.    On May 2, 2008, defendants caused Lehman to file a Prospectus Supplement to the

13  May 30, 2006 Registration Statement, pursuant to the offering of 7.5% Subordinated Notes due

14  2038.  CalPERS purchased $341,075,000 in these notes pursuant to the offering.[3]

15       125.    The Prospectuses omitted important information about Lehman's exposure to the

16  subprime and Alt-A markets, including its risky lending practices, and how the changes in the

17  market were affecting Lehman by the time of the Offerings, including omitting information about

18  how this exposure could affect the Company's capital base.  The Prospectuses failed to disclose

19  serious impairments in Lehman's portfolio of subprime mortgage securities and concealed liabilities

20  associated with the marketing of high-risk securities, such as mortgage-backed securities.

21       126.    The Registration Statement/Prospectuses contained untrue statements of material fact

22  or omitted to state other facts necessary to make the statements made therein not misleading and

23  were not prepared in accordance with applicable SEC rules and regulations.

24       127.    The statements in the Registration Statement/Prospectuses were false and/or

25  misleading because they failed to disclose the true risks surrounding the Company's real estate-

26  _____

27  [3]    The Prospectus Supplements referenced above along with pricing supplements and the
prospectus contained in the Registration Statement are referred to herein as the "Prospectuses."

28

related assets by misrepresenting the risky management practices in place at Lehman and by downplaying the risks associated with its subprime and Alt-A lending practices, which significantly increased the risk level of the Lehman Notes.

128.    Thereafter, despite the subprime mortgage crisis, throughout the remainder of FY 2006 and throughout FY 2007 and into FY 2008, the Officer Defendants continued to issue false and defective statements concerning Lehman's operations and its accounting for its real estate-related assets.

129.    Moreover, the Officer Defendants downplayed the Company's exposure to the real estate crisis and provided assurances that Lehman had engaged in proper hedging strategies and other risk management tactics in order to mitigate the Company's exposure.

130.    On March 14, 2007, Lehman announced record first quarter 2007 results in spite of the growing concerns in the subprime market.  In the press release announcing the first quarter results, defendant Fuld, touting the record results, stated, "[b]y expanding our global footprint, building our capabilities and partnering with our clients, we have again posted record net revenues, net income and earnings per share.  Our results clearly demonstrate that we are better positioned than ever to create value for our clients and our shareholders."

131.    Later that same day on a conference call with analysts and investors, defendant O'Meara downplayed the effect the disruption in the subprime market had on Lehman's business. According to O'Meara:

> Before we move on to our outlook I want to take a minute to discuss recent market events and provide a bit more color on the topic of mortgages.  Recent market adjustments have represented a repricing of risk with a widening of credit spreads, increased levels of volatility, and pricing adjustments in the equity markets.  Given our diversified business model, parts of our business actually benefit from wider spreads and higher volatility.  We expect clients to remain active in managing their portfolios through this part of the cycle and we stand ready to service this activity flow.
>
> The current dislocations in the subprime mortgage market are consistent with late cycle trends where credit standards and pricing are lowered to maintain volumes when liquidity is ample.  The situation has clearly been exacerbated by a wave of early payment defaults and more recently the bankruptcy of a number of monoline subprime mortgage lenders.  ***While we are not immune to these events, we believe we have done a very good job of managing the risks within our securitization business including the active hedging strategies we employed to mitigate our risks***.  This is demonstrated by the fixed income results we have reported today.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

*The subprime components of our mortgage business which include origination, securitization, and trading in the U.S. together account for a small portion of our revenues*. To put this into perspective, into context, over the past six quarters on average, these three businesses all taken together, accounted for less than 3% of our firm-wide revenues. Additionally, our mortgage origination platform is very flexible because of its integration with our mortgage securitization platform in terms of intelligence on deal structure, collateral type, and pricing terms. In the U.S. subprime space, we have adhered to our origination standards. In terms of origination, we remain far more active in the prime and Alt A space which accounted for 75% of our origination volumes in the third quarter.

*From a balance sheet perspective, we believe we are well protected. We actively hedged the interest rate and credit components of our inventory positions including our non-investment grade retained interest in securitizations. The majority of which are prime mortgage related*. Recent market developments, such as the introduction of single name and index credit derivatives on asset backed products have helped us significantly mitigate our risk. It is important to note at this point, we see the subprime challenges as being a reasonably contained situation. The broader economy is still very strong. Unemployment is low, inflation is in check, and consumer confidence is still strong.

We expect that the U.S. subprime mortgage market will continue to face headwinds in the near term; however, we are now seeing a significant decrease in industry wide capacity in the subprime sector and the beginnings of the return of pricing power. *So we believe we are well positioned to benefit from this evolving situation given our experience in this sector as well as our ample liquidity and risk management practices*. In addition, we expect to see various opportunities as a result of the market dislocations.

Looking forward, although we are expecting continued challenges in part of the U.S. mortgage market, our outlook remains optimistic for the rest of our businesses.

132.    On June 12, 2007, Lehman again announced record results for the second quarter of 2007. Defendants Fuld and O'Meara continued to emphasize the "record" results and the Company's strong liquidity and risk management practices and further continued to downplay Lehman's exposure to the growing troubles in the real estate market.

133.    On September 18, 2007, Lehman announced positive results for the third quarter of 2007 at a time when many of the Company's competitors began to announce massive write-downs and substantial losses, and despite Lehman's announcement that it would be forced to close BNC, its subprime lender. Defendant Fuld remained upbeat concerning Lehman's results and outlook, stating: "Despite challenging conditions in the markets, our results once again demonstrate the diversity and financial strength of the Lehman Brothers franchise, as well as our ability to perform across cycles. . . . We remain focused on delivering significant long term value for our clients and

shareholders."  Defendant O'Meara in a conference call attributed these strong results to "[o]ur strong risk management culture with regard to the setting of risk limits, and the management of market and counter-party credit risks, and our strong liquidity framework."  O'Meara further represented the following concerning Lehman's liquidity:

> ***Next I would like to discuss our liquidity position, which is now stronger than ever.***  As we have discussed with you in the past, we have structured our liquidity framework to cover our funding commitments and cash outflows for a 12-month period, without raising new cash in the unsecured markets, or selling assets to generate cash. . . .

> . . . Our conservative liquidity framework is based on the following principles: No reliance on short-term unsecured funding, including asset-backed commercial paper. Illiquid assets are funded with long term capital with a remaining life of 12 months or longer.

134.   On December 13, 2007, Lehman announced positive fourth quarter and year end 2007 results.  Defendant Fuld continued emphasizing the positive results.  Later in a conference call, defendants O'Meara and Callan once again downplayed the effect of the mortgage crisis on Lehman's operations.  Further, O'Meara and Callan continued to represent Lehman's "strong" liquidity position and how Lehman's conservative liquidity framework was structured to cover the Company's funding commitments and cash outflows for a 12-month period.

135.   In January 2008, an internal presentation was made to the Lehman board concerning the real estate crisis and its impact on Lehman.  During the presentation, the Officer and Director Defendants were warned that the Company's liquidity could disappear fast.  The internal analysis questioned "WHY DID WE ALLOW OURSELVES TO BE SO EXPOSED?"  The analysis indicated that the "CONDITIONS [WERE] CLEARLY NOT SUSTAINABLE" and that Lehman "SAW WARNING SIGNS" but "DID NOT MOVE EARLY/FAST ENOUGH," and further that the Company lacked "DISCIPLINE ABOUT CAPITAL ALLOCATION."

136.   After Bear Stearns Companies Inc. collapsed in March 2008, rumors began circulating that Lehman faced a similar cash crunch, and many Wall Street observers believed Lehman would be the next investment bank failure after Bear Stearns, and, as a result, Lehman stock took a hit.  Nonetheless, defendants denied the rumors and maintained that Lehman remained a strong and viable Company.

137.    On March 18, 2008, Lehman again announced positive first quarter 2008 results. During the conference call held the same day, defendant Callan went to great lengths to assure investors that Lehman was not in fact going to be the next Bear Stearns and had maintained strong risk management practices which helped to insulate the Company from its Alt-A and subprime exposure.  Defendant Callan further maintained the Company had a strong liquidity and capital base:

> We saw a quarter where our risk management discipline allowed us to avoid any single outsize loss.  And it's been our operating philosophy for a decade, which many people are very familiar with, that we remain closely focused on our liquidity, our long-term capital position, precisely for the purpose of weathering a difficult market environment that we've seen surfacing in recent weeks.  So we're set up for that.
>
> *    *    *
>
> ***We had disciplined liquidity and capital management, which we consider to be a core competency, and maintained robust liquidity to date***, and we've executed close to two-thirds of our full-year capital plan at the end of the first quarter.
>
> *    *    *
>
> Next, I'd like to review our liquidity position in a different way than we typically do and give you a lot more information.  And I'm going to give you information that takes you through the quarter end and actually takes you through end of day yesterday.  ***And I think that, given the environment we're in, we've tried to add a lot more transparency here, as we've tried to relay the strengths and robustness of the liquidity position of the Firm***.
>
> As we've discussed in the past, we have structured our liquidity framework for a decade to cover expected cash outflows for the next 12 months.  And we do so without being able to raise new cash in the unsecured markets, or without having to sell assets that are outside our liquidity pool, and the liquidity pool is comprised of basically cash and cash equivalents. ***The framework I'm describing was specifically designed after 1998 and our experiences then, for this type of environment, so I want to be clear about that.***
>
> *    *    *
>
> Also, for those who saw it, Moody's reaffirmed our A1 credit rating yesterday, with some very good commentary about the strength of the capital base in the franchise and the liquidity.
>
> ***So that's a fair amount of color I tried to give you about how we fund ourselves, why we feel comfortable with our liquidity, even absent the fed facility, would feel very comfortable***.  The fed facility is a great addition to the equation, and why we think we're in a good position in today's market.  So wanted to make sure everybody was fully engaged and had all the information that they needed on that front.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 36 -

1    138.    On June 3, 2008, several executives from Lehman's money management subsidiary,

2  Neuberger Berman, sent an email to Lehman's executive committee recommending that Lehman's

3  top management forego bonuses for the year.   According to the email, "***Many believe that a***

4  ***substantial portion of the problems at Lehman are structural rather than merely cyclical in***

5  ***nature***."   The executive committee member who was in charge of the Neuberger division responded

6  to the executive committee as follows:

7          I am not sure what's in the water at 605 Third Avenue today, but Amato and I
          clearly have some work to do (given the [sic] today's similar emails from Marvin
8          Schwartz, Michael Kaminsky and now Judy).

9          The compensation issue she raises (Judy Vale and Benjamin Segal on one
          hand versus Marvin Schwartz and Jeff Bolton on the other) is a particular issue for a
10         small handful of people at Neuberger and hardly worth the EC's time now.

11         I'm embarrassed and I apologize.

12    139.    The email was forwarded the same day to defendant Fuld, who responded: "Don't

13  worry-they are only people who think about their own pockets."

14    140.    On June 9, 2008, Lehman pre-announced its expected second quarter 2008 results,

15  announcing its first quarterly loss since being spun off from American Express.   However,

16  defendants maintained the Company had a strong liquidity and capital position.   Defendant Fuld

17  stated: "I am very disappointed in this quarter's results.   Notwithstanding the solid underlying

18  performance of our client franchise, we had our first-ever quarterly loss as a public company.

19  However, with our strengthened balance sheet and the improvement in the financial markets since

20  March, we are well-positioned to serve our clients and execute our strategy."

21    141.    On June 12, 2008, Lehman announced that defendant Callan was being replaced as

22  CFO by Ian Lowitt ("Lowitt").

23    142.    On June 16, 2008, Lehman announced its second quarter 2008 results.   According to

24  defendant Fuld:

25         "Since we announced our expected second quarter earnings last week, ***we have***
          ***begun to take the necessary steps to restore the credibility of our great franchise***
26         ***and ensure that this quarter's unacceptable performance is not repeated***.   We have
          raised an additional $6 billion of capital.   I have asked Bart McDade, our best
27         operator, to serve as the Firm's president and chief operating officer.   I have also
          asked Ian Lowitt, our co-chief administrative officer, to be our chief financial officer.
28         With these actions and our continued commitment to our client-driven franchise, we

are positioned to take advantage of opportunities that lie ahead, and we are focused on maximizing shareholder value."

As his predecessors did, newly named CFO Lowitt stated in a conference call in which defendant Fuld participated as follows: "Next, let me review our liquidity position which has never been stronger."

143.    Then, in September 2008, Lehman announced additional billions of dollars in losses and that it would need to raise billions of dollars of additional capital.  Thereafter, the price of Lehman securities continued to react adversely as it was disclosed that Lehman was in fact almost insolvent.  When it became apparent the federal government would not rescue Lehman, the Company was forced to file Chapter 11 bankruptcy on September 15, 2008, essentially wiping out its equity and debt holders.  The Lehman Notes in the Offerings immediately dropped from above 80% of par to 1% of par.  This was the largest corporate bankruptcy in the history of the United States.

144.    The true facts, which were known by the defendants but concealed from plaintiff during the Relevant Period, were as follows:

(a)    Lehman's true exposure to risk from mortgage-related transactions and assets was understated.

(b)    Lehman's subsidiaries, BNC and Aurora, were engaging in high-risk residential mortgage lending practices, which resulted in mortgage loans that would be much more likely to end up defaulting and causing losses.

(c)    Defendants failed to properly mitigate the risks associated with Lehman's mortgage financing activities.

(d)    Lehman violated GAAP in preparing and disseminating false and misleading financial statements with respect to its accounting for mortgage-related assets.

(e)    Lehman was engaging in quarter end accounting manipulations that understated its debt in quarterly financial statements by billions of dollars.

(f)    The extent of Lehman's leverage exposure was misstated.

1        (g)     Defendants represented that all of Lehman's assets were presented at "fair

2   value." Lehman, however, failed to consider market information when valuing certain of its

3   commercial real estate assets, thereby materially overstating their value.

4        (h)     Lehman's internal controls were inadequate to prevent the Company from

5   engaging in risky lending practices.

6        (i)     The Company's capital base was not adequate enough to withstand the

7   significant deterioration in the real estate markets, and, as a result, Lehman would be forced to file

8   for bankruptcy protection due to its subprime and Alt-A exposure.

9                     **LEHMAN'S FALSE FINANCIAL REPORTING**

10       145.    Lehman's financial statements, including its financial statements for FY 2005 and

11   interim results for FY 2006, which were incorporated by reference into the Registration Statement

12   and Prospectuses, were not a fair presentation of the Company's results and were presented in

13   violation of GAAP and SEC rules.  Lehman's financial statements for FY 2007 and interim FY 2008

14   were similarly false and misleading.

15       146.    GAAP are those principles recognized by the accounting profession as the

16   conventions, rules and procedures necessary to define accepted accounting practice at a particular

17   time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the

18   SEC which are not prepared in compliance with GAAP are presumed to be misleading and

19   inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial

20   statements must also comply with GAAP, with the exception that interim financial statements need

21   not include disclosure which would be duplicative of disclosures accompanying annual financial

22   statements.  17 C.F.R. §210.01(a).

23       147.    A fundamental precept of GAAP is that impairment of securities which is deemed to

24   be other than temporary should be recorded as a charge against earnings.  Defendants failed to

25   properly account for Lehman's impaired investments in violation of GAAP.

26

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

**Lehman Failed to Disclose Its Improper and Misleading REPO 105 Transactions**

148.    Defendants failed to disclose that Lehman's 2006-2008 financial results were falsified, materially misleading, and not presented in accordance with GAAP due to Lehman's increasing use of an accounting maneuver it called REPO 105.

149.    A repurchase or "repo" transaction is  a transaction in which a borrower temporarily gives a financial security to a lender as collateral in order to obtain a cash loan, but "repurchases" the security at the end of the redemption period to pay off the loan.  In a typical banking industry repurchase transaction, a bank seeking to meet short-term cash needs borrows money from a large counterparty on a short-term basis, typically at a fixed interest rate.  In order to effect the repurchase loan, the bank must deliver or provide agreed-upon collateral in the form of a high grade security, such as a treasury bond, and concurrently agrees to repurchase the same security back from the lender at a fixed price by some agreed-upon later date.  Because such a transaction is, in substance, a secured loan, accounting rules require that this transaction be accounted for as a collateralized borrowing: the bank records debt on its balance sheet for the loan, the securities used to collateralize the loan remain on the bank's balance sheet, and the incoming loan proceeds are accounted for as "Cash provided by financing activities" on the company's Statement of Cash Flows.

150.    Lehman began using REPO 105 transactions as far back as 2001, but began using them more in late 2007 as bank leverage became more of an issue.

151.    According to the Bankruptcy Examiner's 2,200 page report on Lehman, an April 2008 email asking about REPO 105 generated a response by Bart McDade, the firm's then-head of equities and subsequently its chief operating officer: "'I am very aware . . . it is another drug we r [sic] on.'"  At its peak in the second quarter of 2008, Lehman used REPO 105 to effectively move approximately $50 billion of assets off its balance sheet, according to the Examiner's report.

152.    Lehman's trick was to use a clause in the accounting rules to classify the deal as a sale, even though it was still obliged to repurchase the assets at a later date.  That meant the assets disappeared from the balance sheet, and it could use the cash it received to temporarily pay down other liabilities.

153.    Emails cited by the Examiner's report describe the transactions as "'window-dressing'" and an "'accounting gimmick,'" and state, "'We have a desperate situation and I need another 2 billion from you [for first quarter 2008] either through Repo 105 or outright sales.  Cost is irrelevant, we need to do it.'"

**Lehman's Use of REPO 105 Transactions Was Material**

154.    Lehman's REPO 105 transactions represented billions of dollars of quarter-end manipulations.  According to the Examiner's report, Lehman's REPO 105 transactions totaled the following amounts:

| | Q4 2006 | Q1 2007 | Q2 2007 | Q3 2007 | Q4 2007 | Q1 2008 | Q2 2008 |
|---|---|---|---|---|---|---|---|
| **REPO 105** | $19.213 billion | $20.578 billion | $23.054 billion | $29.054 billion | $29.727 billion | $42.200 billion | $44.536 billion |

155.    By classifying certain repo borrowings as "sales," Lehman also artificially inflated certain risk-based capital ratios, including its "Tier one leverage" ratio.  Because banks are expected to maintain capital ratios at certain levels in order to be considered adequately capitalized, these ratios are closely followed by investors, security analysts and rating agencies.

156.    Without further disclosure of Lehman's contrived accounting for repos and its impact on reported risk-based capital ratios, investors and analysts had no way of knowing Lehman's Tier one leverage ratio was misleading.

157.    Accounting rules, including Statement of Financial Accounting Standards No. 140 ("SFAS 140") and related literature require that a transaction be accounted for in accordance with its economic substance, rather than its mere form.  This accounting guideline applies to all transactions, including Lehman's repurchase transactions, and is reflected broadly in GAAP.  For example, FASB Statements of Financial Accounting Concepts No. 2, *Qualitative Characteristics of Accounting Information*, ¶160, states:

> The quality of reliability and, in particular, ***representational faithfulness leaves no room for accounting representations that subordinate substance to form***.

158.    Accordingly, accounting for a transaction or event should generally be faithful to its economic reality. The substance is the economic reality of the facts and circumstances stipulated in the arrangement. While substance and form may be the same, they sometimes differ.  To evaluate the

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

substance of a transaction, it is necessary to consider all the information reflective of the economic reality of the situation rather than to focus on the form in an isolated document.  The following authoritative auditing literature further emphasizes the underlying importance of ensuring that the accounting treatment reflects the substance of the transaction:

> [T]he auditor should be aware that the substance of a particular transaction could be significantly different from its form and that *financial statements should recognize the substance of particular transactions rather than merely their legal form*.

AU §334.02.

> *Generally accepted accounting principles recognize the importance of reporting transactions and events in accordance with their substance*.  The auditor should consider whether the substance of transactions or events differs materially from their form.

AU §411.06.

159.    Lehman knew that the economic substance and intent of its REPO 105 transactions was that they were, in fact, borrowings, not the selling of trading securities.

**Lehman Violated GAAP and SEC Rules by Not Disclosing Its Practises with Respect to Repo Sales Transactions in Its Form 10-Ks and 10-Qs**

160.    Lehman was required, but failed, to disclose any information regarding its accounting policies for repo sales transactions, and the transactions' impact on the Company's publicly reported financial statements and metrics in 2006-2008.  GAAP establishes how particular types of account balances, activity and events are to be disclosed within a company's financial statements.  Similarly, SEC rules establish incremental disclosure requirements in both Lehman's financial statement footnotes and the MD&A sections of its Form 10-K and 10-Q SEC filings.  Such required disclosures are essential to investors', analysts' and rating agencies' understanding of a public company's financial statement, and are considered an integral part of the financial statements and SEC filing.  The SEC Staff has generally observed that an issuer's MD&A should provide an explanation of the company's financial statements "through the eyes of management."  *See Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, SEC Release FR No. 72, §B (Dec. 29, 2003).  GAAP further requires that accounting policy disclosures in the footnotes to the financial statements must contain disclosures for accounting principles that materially affect the determination of cash flows.  *See* Accounting

Principles Board Opinion No. 22, *Disclosure of Accounting Polices*, ¶12, and FASB Statements of Financial Accounting Concepts Nos. 1 and 2. As alleged above, Lehman's accounting principles regarding repo sales contracts clearly impacted the presentation of Lehman's cash flows in a material way and, accordingly, should have been disclosed.

161. There can be no dispute that Lehman did not disclose any information regarding its accounting for repo transactions as sales rather than borrowings in any of its 2006-2008 Form 10-K or 10-Q SEC filings. The Bankruptcy Examiner noted in footnote 3497:

> The Examiner has investigated Lehman's use of Repo 105 transactions and has concluded that the balance sheet manipulation was intentional, for deceptive appearances, had material impact on Lehman's net leverage ratio, and, because Lehman did not disclose the accounting treatment of these transactions, rendered Lehman's Forms 10-K and 10-Q (financial statements and MD&A) deceptive and misleading.

162. Due to these accounting improprieties, Lehman's financial results and statements for FY 2005 through FY 2008 violated GAAP, including the following fundamental accounting principles:

(a) The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b) The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c) The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d) The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

1  accountability to prospective investors and to the public in general (FASB Statement of Concepts

2  No. 1, ¶50);

3          (e)     The principle that financial reporting should provide information about an

4  enterprise's financial performance during a period was violated.  Investors and creditors often use

5  information about the past to help in assessing the prospects of an enterprise.  Thus, although

6  investment and credit decisions reflect investors' expectations about future enterprise performance,

7  those expectations are commonly based at least partly on evaluations of past enterprise performance

8  (FASB Statement of Concepts No. 1, ¶42);

9          (f)     The principle that financial reporting should be reliable in that it represents

10  what it purports to represent was violated.  That information should be reliable as well as relevant is

11  a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

12          (g)     The principle of completeness, which means that nothing is left out of the

13  information that may be necessary to insure that it validly represents underlying events and

14  conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

15          (h)     The principle that conservatism be used as a prudent reaction to uncertainty to

16  try to ensure that uncertainties and risks inherent in business situations are adequately considered

17  was violated.  The best way to avoid injury to investors is to try to ensure that what is reported

18  represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

19       163.    Further, the undisclosed adverse information is the type of information which,

20  because of SEC regulations, regulations of the national stock exchanges and customary business

21  practice, is expected by investors and securities analysts to be disclosed and is known by corporate

22  officials and their legal and financial advisors to be the type of information which is expected to be

23  and must be disclosed.

24  **Failure to Disclose Known Trends and Uncertainties**

25       164.    The defendants caused Lehman to fail to disclose known trends and uncertainties

26  related to its true risk exposure to subprime and Alt-A related assets in violation of SEC regulations.

27  Defendants caused Lehman to provide misleading disclosures concerning the risks surrounding the

28  Company's real estate-related assets by misrepresenting the risk management practices in place at

1   Lehman and by downplaying the risks associated with subprime and Alt-A lending practices.

2   Defendants further caused Lehman to fail to disclose known trends and uncertainties related to its

3   increased use of leverage.

4          165.    SEC Regulations, Item 7 of Form 10-K and Item 2 of Form 10-Q, *Management's*

5   *Discussion and Analysis of Financial Condition and Results of Operations*, require the issuer to

6   furnish information required by Item 303 of Regulation S-K (17 C.F.R. §229.303) ("Item 303").  In

7   discussing results of operations, Item 303 requires the registrant to:

8          Describe any known trends or uncertainties that have had or that the registrant
           reasonably expects will have a material favorable or unfavorable impact on net sales
9          or revenues or income from continuing operations.

10         166.    The instructions to Item 303(a) further state:

11         The discussion and analysis shall focus specifically on material events and
           uncertainties known to management that would cause reported financial information
12         not to be necessarily indicative of future operating results . . . .

13         167.    In addition, in its May 18, 1989 Interpretive Release No. 34 26831, the SEC has

14   indicated that registrants should employ the following two-step analysis in determining when a

15   known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303:

16         A disclosure duty exists where a trend, demand, commitment, event or uncertainty is
           both presently known to management and reasonably likely to have a material effect
17         on the registrant's financial condition or results of operation.

18         168.    The MD&A requirements are intended to provide, in one section of a filing, material

19   historical and prospective textual disclosure enabling investors and other users to assess the financial

20   condition and results of operations of the registrant, with particular emphasis on the registrant's

21   prospects for the future.  As *Concept Release on Management's Discussion and Analysis of*

22   *Financial Condition and Operations*, Securities Act of 1933, Release No. 33-6711, 1987 SEC

23   LEXIS 2001, at *6-*7 (Apr. 21, 1987), states:

24         The Commission has long recognized the need for a narrative explanation of
           the financial statements, because a numerical presentation and brief accompanying
25         footnotes alone may be insufficient for an investor to judge the quality of earnings
           and the likelihood that past performance is indicative of future performance.  MD&A
26         is intended to give the investor an opportunity to look at the company through the
           eyes of management by providing both a short and long-term analysis of the business
27         of the company.

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 45 -

169.    Item 303 states:

To the extent that the financial statements disclose material increases in net sales or revenues, provide a narrative discussion of the extent to which such increases are attributable to increases in prices or to increases in the volume or amount of goods or services being sold or to the introduction of new products or services.

170.    And the instructions to Item 303(a) further state:

Where the consolidated financial statements reveal material changes from year to year in one or more line items, the causes for the changes shall be described to the extent necessary to an understanding of the registrant's businesses as a whole . . . .

171.    According to *Management's Discussion and Analysis of Financial Condition and Results of Operations*, Securities Act Release No. 6349 (Sept. 28, 1981):

It is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.

172.    Nonetheless, in violation of both GAAP and SEC rules, Lehman's FY 2005 through FY 2008 Form 10-Ks and 10-Qs failed to disclose known trends and uncertainties related to Lehman's operations. Defendants caused Lehman to misrepresent the Company's risk management practices and to minimize the Company's true risk exposure associated with its real estate-related assets and its leverage exposure.

173.    In Lehman's FY 2005 Form 10-K, Lehman failed to provide any discussion of its subprime and Alt-A lending activities and provided only a brief discussion concerning its mortgage origination business. Lehman failed to provide any disclosures concerning the high risk lending practices being engaged in at Aurora and BNC. Lehman further provided misleading disclosures concerning its leverage exposure and its risk management practice, claiming the Company had engaged in adequate risk management to mitigate its risk to the "greatest extent possible." Lehman's first through third quarter FY 2006 Form 10-Qs provided the same misleading disclosures. Lehman's misleading disclosures contained in its FY 2005 Form 10-K and interim Form 10-Qs for FY 2006 were incorporated into the Offering Documents.

174.    Thereafter, Lehman continued providing inadequate and misleading disclosures concerning its subprime and Alt-A lending practices and the risks associated with its real estate-related holdings, including the risks associated with its increased use of leverage throughout FY

1   2006 and FY 2007 and even into FY 2008.  Even when Lehman began to acknowledge some of the

2   risks, it continued to downplay the risks.  Lehman failed to disclose known trends and uncertainties

3   in violation of SEC regulations by not providing full and adequate disclosures.  Lehman's failure

4   provided investors with a false and misleading depiction of the Company's operations.

5                    **LOSS CAUSATION/ECONOMIC LOSS**

6           175.    Between June 12, 2007 and September 15, 2008, the price of Lehman common stock

7   was artificially inflated as a result of the material misrepresentations and omissions set forth above.

8   The artificial inflation was removed through a series of partial disclosures and the materialization of

9   previously concealed risks.

10          176.    On June 9, 2008, Lehman issued a press release announcing its financial results for its

11  second quarter of 2008, ended May 31, 2008.  Despite having previously announced success with its

12  delevering plan, its strong liquidity position, that it had risk management policies in place and that its

13  assets were fairly valued, the press release disclosed that Lehman took $4 billion in mark-to-market

14  write-downs, including $2.4 billion in residential mortgage related holdings, $700 million in

15  commercial positions, and $300 million in real estate held for sale. In addition, the Company

16  announced that it would raise $6 billion through a combined offering of preferred and common

17  shares. On this news, Lehman's shares declined 8.7% and continued to fall an additional 19.44%

18  over the next two days. In addition, rating agencies Fitch and Moody's downgraded Lehman's credit

19  rating. However, the June 9, 2008 announcement only partially revealed the truth, and Lehman

20  continued to misrepresent its financial condition.

21          177.    On September 8, 2008, Lehman announced that it would release its third quarter 2008

22  results and key strategic initiatives for the Company on September 18, 2008. Analysts at Bernstein

23  Research and Oppenheimer predicted further write-downs in the third quarter of between $4 and $5

24  billion. In addition, there were market reports of Lehman's potential sale of assets to raise capital,

25  which market commentators said smacked of desperation and indicated problems with Lehman's

26  liquidity position. As a result of this news, Lehman's shares finished the trading day down 12.7%.

27          178.    On September 9, 2008, there were market reports that Lehman's attempts to obtain a

28  capital infusion from the Korea Development Bank had failed, leading to concerns that "no one will

1   inject capital" into Lehman.  In addition, S&P and Fitch both placed their ratings on Lehman on

2   review for downgrade.  S&P specifically cited concerns about Lehman's ability to raise capital.  On

3   this news, Lehman's shares declined 45% from the prior day's price to close at $7.79 per share.

4           179.    On September 10, 2008, Lehman reported a $3.9 billion loss for the third quarter of

5   2008, as well as $7 billion in gross write-downs on its residential and commercial real estate

6   holdings, despite having previously announced success with its delevering plan, its strong liquidity

7   position, that it had risk management policies in place and that its assets had been fairly valued.  In

8   announcing the results during the conference call, Lowitt, having replaced Callan as CFO, also

9   disclosed that "[t]he majority of our write-downs were in Alt-A driven by increase in Alt-A

10  delinquencies and loss expectations which were specific to Alt-A prices and did not affect the

11  performance of our hedges." Contrary to defendants' earlier statements, Lowitt admitted that

12  "unfortunately there is no direct hedge for Alt-A assets."  In addition, Fitch and Dunn & Bradstreet

13  downgraded Lehman's credit rating. On this news Lehman's shares declined 7% from the prior day's

14  close to $7.25 per share.

15          180.    On September 15, 2008, Lehman filed for bankruptcy protection because it had

16  "significant liquidity problems." As a result, Lehman's shares declined over 94% on that date.

17          181.    The disclosures regarding Lehman's massive write-downs and liquidity problems

18  (which led to Lehman's bankruptcy) revealed the truth about Lehman's financial condition and

19  represented the materialization of several interrelated, concealed risks from Lehman's disregard for

20  its risk limits and its massive REPO 105 transactions which masked the Company's net leverage and

21  true liquidity issues. As set forth above, as a direct result of Lehman's failure to abide by its risk

22  limits and risk management policies, Lehman acquired tens of billions of dollars of highly risky,

23  illiquid assets that ultimately required enormous write-downs and triggered the liquidity crisis that

24  ended Lehman's existence.  During the Relevant Period, in order to conceal the problems with its

25  balance sheet, and in particular the amount of troubled assets it held, Lehman engaged in tens of

26  billions of dollars worth of REPO 105 transactions in order to temporarily remove assets from its

27  balance sheet solely for reporting purposes.  Through these sham transactions, Lehman artificially

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

reduced its net leverage ratio, fraudulently preserved its credit ratings, and created the appearance that Lehman was more capitalized and liquid than it really was.

182.    The declines in the price of Lehman securities and resulting losses are directly attributable to the disclosure of information and materialization of risks that were previously misrepresented or concealed by the Officer Defendants.  Had plaintiff known of the material adverse information not disclosed by the Officer Defendants or been aware of the truth behind their material misstatements, they would not have purchased Lehman securities at artificially inflated prices.

### NO SAFE HARBOR

183.    Defendants' verbal "Safe Harbor" warnings accompanying Lehman's oral forward-looking statements ("FLS") issued during the Relevant Period were ineffective to shield those statements from liability.

184.    The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Lehman who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

### COUNT I

**For Violation of §10(b) of the 1934 Act and Rule 10b-5
Against the Officer Defendants**

185.    Plaintiff incorporates ¶¶1-184 by reference.

186.    During the Relevant Period, the Officer Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

187.   The Officer Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)   employed devices, schemes and artifices to defraud;

(b)   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff in connection with its purchases of Lehman common stock and the Lehman Notes during the Relevant Period.

188.   Plaintiff has suffered damages in that, in reliance on the integrity of the market, it paid artificially inflated prices for Lehman common stock and the Lehman Notes.  Plaintiff would not have purchased Lehman common stock and the Lehman Notes at the prices it paid, or at all, if it had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Officer Defendants

189.   Plaintiff incorporates ¶¶1-188 by reference.

190.   The Officer Defendants acted as controlling persons of Lehman within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Lehman stock, the Officer Defendants had the power and authority to cause Lehman to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Officer Defendants are liable pursuant to §20(a) of the 1934 Act.

## COUNT III

### For Violation of §11 of the 1933 Act
### Against Defendants O'Meara, the Director Defendants
### and the Underwriter Defendants

191.   Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that

1   could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based

2   solely on claims of strict liability and/or negligence under the 1933 Act.

3   192.   This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, against

4   defendants O'Meara, the Director Defendants and the Underwriter Defendants.

5   193.   The Registration Statement for the Offerings was inaccurate and misleading,

6   contained untrue statements of material facts, omitted to state other facts necessary to make the

7   statements made not misleading, and omitted to state material facts required to be stated therein.

8   194.   The defendants named herein were responsible for the contents and dissemination of

9   the Registration Statement.

10   195.   Each of the Director Defendants and O'Meara signed or authorized the signing of the

11   Registration Statement or was identified in the Offering Documents.

12   196.   The Underwriter Defendants were responsible for the contents and dissemination of

13   the Registration Statement and did not perform adequate due diligence.  The Underwriter Defendants

14   were underwriters of certain of the Offerings.  The Underwriter Defendants acted negligently and are

15   liable to plaintiff who purchased or otherwise acquired the Lehman Notes sold pursuant or traceable

16   to the Offerings in which each Underwriter Defendant participated.

17   197.   None of the defendants named herein made a reasonable investigation or possessed

18   reasonable grounds for the belief that the statements contained in the Registration Statement were

19   true and without omissions of any material facts and were not misleading.

20   198.   By reason of the conduct herein alleged, each defendant named herein violated,

21   and/or controlled a person who violated, §11 of the 1933 Act.

22   199.   Plaintiff acquired the Lehman Notes pursuant and/or traceable to the Registration

23   Statement for the Offerings.

24   200.   The defendants named in this Count owed to plaintiff the duty to make a reasonable

25   and diligent investigation of the statements contained in the Registration Statement, and any

26   incorporated documents, at the time each such Offering became effective to ensure that said

27   statements were true and that they were not misleading.  Defendants O'Meara, the Director

28   Defendants and the Underwriter Defendants did not make a reasonable investigation or possess

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

reasonable grounds to believe that the statements contained in the Registration Statement were true, were without omissions of any material facts, and were not misleading.  Accordingly, defendants O'Meara, the Director Defendants and the Underwriter Defendants acted negligently and are therefore liable to plaintiff.

201.    At the time of its purchases of the Lehman Notes, plaintiff was without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to 2008.  Less than one year, as tolled by the pending class action, has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this Count is based from the time that the initial complaint was filed asserting claims arising out of the Registration Statement. Less than three years, as tolled by the pending class action, has elapsed from the time that the securities upon which this Count is brought were offered in good faith to the public to the time that the initial complaint was filed.

## COUNT IV

### For Violation of §12(a)(2) of the 1933 Act
### Against All Defendants

202.    Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

203.    By means of the defective Prospectuses, defendants assisted in sale of shares of the Lehman Notes to plaintiff in the Offerings.

204.    The Prospectuses contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Defendants owed plaintiff, who purchased the Lehman Notes pursuant to the Prospectuses, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectuses as set forth above.

205.  Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectuses at the time it acquired the Lehman Notes.

206.  By reason of the conduct alleged herein, defendants violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, plaintiff sustained substantial damages in connection with its purchases of the Lehman Notes pursuant to the Prospectuses.  Accordingly, plaintiff has the right to rescind and recover the consideration paid for the Lehman Notes, and hereby tenders its shares to the defendants sued herein and to the extent permitted by law.

**COUNT V**

**For Violation of §15 of the 1933 Act**
**Against Defendants Fuld, O'Meara and Callan**

207.  Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

208.  This Count is asserted against defendants Fuld, O'Meara and Callan for violation of §15 of the 1933 Act, 15 U.S.C. §77o, on behalf of plaintiff who purchased or otherwise acquired the Lehman Notes pursuant or traceable to the Offerings and was damaged thereby.

209.  At all relevant times, defendants Fuld, O'Meara and Callan were controlling persons of the Company within the meaning of §15 of the 1933 Act.  Each of these defendants served as an executive officer and/or director of Lehman prior to and at the time of the Offerings.

210.  Defendants Fuld, O'Meara and Callan at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Lehman's business affairs.  As officers and directors of a publicly owned company, defendants Fuld, O'Meara and Callan had a duty to disseminate accurate and truthful information with respect to Lehman's financial condition and results of operations.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

211.    Because of their positions of control and authority as officers and/or directors of Lehman, defendants Fuld, O'Meara and Callan were able to, and did, control the contents of the Offering Documents, which contained materially untrue financial information.

212.    By reason of the aforementioned conduct, each of these defendants is liable under §15 of the 1933 Act, jointly and severally, to plaintiff.  As a direct and proximate result of the conduct of defendants Fuld, O'Meara and Callan, plaintiff suffered damages in connection with its purchase or acquisition of the Lehman Notes.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Awarding plaintiff damages in an amount which may be proven at trial, together with interest thereon;

B.    Awarding plaintiff pre-judgment and post-judgment interest, as well as its reasonable attorney and expert witness fees and other costs;

C.    Awarding plaintiff rescission and/or rescissory damages; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  February 7, 2011                                ROBBINS GELLER RUDMAN
                                                                            & DOWD LLP
                                                                    SHAWN A. WILLIAMS


                                                        _____

                                                                    SHAWN A. WILLIAMS

                                                        Post Montgomery Center
                                                        One Montgomery Street, Suite 1800
                                                        San Francisco, CA  94104
                                                        Telephone:  415/288-4545
                                                        415/288-4534 (fax)

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
MICHAEL J. DOWD
DAVID C. WALTON
THOMAS E. EGLER
MATTHEW I. ALPERT
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff